**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| LLOYD HICKS JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 12-cv-217-TLW |
| ) | |
| MICHAEL J. ASTRUE,[1] ) | |
| Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Plaintiff, Lloyd Hicks Jr., pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying plaintiff's application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 et seq. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Claimant appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Claimant was not disabled. For the reasons discussed below, the Court REVERSES AND REMANDS the Commissioner's decision.

**INTRODUCTION**

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled"

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

The role of the court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a).

## BACKGROUND

Plaintiff filed three applications, one dated June 9, 2003, one dated November 17, 2003, and one dated August 27, 2004, for both disability benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. (R. 164-67, 739-41, 168-73, 747-50, 174-77, 757-59). The applications were denied initially and upon reconsideration. (R. 43-45, 74-77, 78-82, 83-87, 746, 756, 765). Plaintiff received one hearing before the ALJ on February 1, 2006. (R. 858-89). The ALJ denied plaintiff's claims on March 24, 2006. (R. 46-58). This decision was remanded by the Appeals Council on June 29, 2006. (R. 106-09). Plaintiff received two more hearings before another ALJ; one on March 15, 2007[2] and one on August 21, 2007. (R. 817-30). The second ALJ also denied plaintiff's claims. (R. 59-73). This decision was also remanded by the Appeals Council on June 5, 2009. (R. 132-36). Plaintiff received a final hearing before a third ALJ on August 13, 2010. (R. 787-816). By decision dated September 16, 2010, the third ALJ also found that plaintiff was not disabled. (R. 18-29). On

---

[2] The ALJ wanted to end this hearing for plaintiff to go home and shower, but plaintiff's attorney told the ALJ that plaintiff consistently does not bathe. The ALJ subsequently allowed the hearing to continue, discovered plaintiff had not been to a mental consultative examination, and ordered that he attend a consultative exam. The August 21, 2007 hearing then addressed plaintiff's case with that examination.

3

March 28, 2012, the Appeals Council denied review of the ALJ's findings. (R. 12-15). Thus, the decision of the ALJ represents a final decision for the purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

**The ALJ's Decision**

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2007, but not after. (R. 23). At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since his alleged onset date of June 2, 2004. Id. At step two, the ALJ found that plaintiff had the severe impairments of major depression and personality disorder. Id. At step three, the ALJ found that plaintiff's impairments, or combination of impairments, did not meet any listing. Id.

The ALJ determined that plaintiff had the Residual Function Capacity ("RFC") to perform the full range of work at all exertional levels, but was limited in the complex work tasks that he can perform while in contact with the general public. (R. 24). At step four, the ALJ found that plaintiff had the ability to perform his past relevant work. (R. 27). Thus, the ALJ found that plaintiff had not been disabled since June 2, 2004. (R. 28).

**The Medical Evidence**

On May 14, 2003, plaintiff was admitted to Grand Lake Mental Health Stabilization Center. (R. 323). His admission was due to a "suicidal attempt" that occurred while he was intoxicated. (R. 345). He was discharged on May 20, 2003, and transferred to HOPE Psychiatric Unit. (R. 322). While at HOPE he was diagnosed with Major Depressive Disorder, severe, without psychotic features. (R. 345). He was discharged on May 30, 2003. (R. 345).

Plaintiff started seeing Michael Collins, M.D., on July 8, 2003. (R. 469). Dr. Collins diagnosed him with Major Depressive Disorder, noting that it was moderate, recurrent, and

without psychotic features. Id. Dr. Collins also diagnosed him with dysthymia disorder and polysubstance dependence. Id. Dr. Collins noted that plaintiff had a history of personality disorder. Id. Plaintiff had a GAF score of 65 at the time of his visit. Id. Dr. Collins prescribed Lexapro and therapy. Id. Dr. Collins noted that plaintiff had a history of alcohol and drug abuse, chronic depressive symptoms, and suicidal threats. (R. 467-69). Dr. Collins noted that plaintiff did not report recent or recurrent suicidal thoughts. Id.

On July 22, 2003, Dr. Collins noted that on a scale of 0-10 (0 = feeling worst ever, and 10 being symptom free), plaintiff felt somewhere between a 3 and 4. (R. 466). Dr. Collins noted that plaintiff had sleep problems, but he was able to get some continued sleep. Id. On August 21, 2003, Dr. Collins noted that plaintiff's mood problems continued. (R. 465). On September 4, 2003, Dr. Collins noted that plaintiff was feeling "about the same." (R. 464). He prescribed Wellbutrin. Id. On October 16, 2003, Dr. Collins noted mood, irritability, and anger problems. (R. 463). Plaintiff felt like a 3 on the 0-10 scale. Id. Dr. Collins wrote that plaintiff was a "complex case." Id. On January 8, 2004, Dr. Collins noted that plaintiff reported sadness and poor sleep. (R. 461). On February 30, 2004, Dr. Collins noted that plaintiff complained of sadness. (R. 454). On March 22, 2004 Dr. Collins noted mood, sleep, and energy problems. (R. 459).

Dr. Collins completed his first of three Medical Source Statements ("MSS") for plaintiff on August 10, 2004. (R. 421-27). Under the category titled Understanding and Memory, Dr. Collins noted that plaintiff was moderately limited in his ability to remember locations and work-like procedures and in his ability to understand and remember simple instructions. (R. 421) He noted that plaintiff was markedly limited in his ability to understand and remember detailed instructions. Id. Under the category titled Attention and Concentration, Dr. Collins noted that

plaintiff was moderately limited in his ability to perform at a consistent pace without an unreasonable number or length of rest periods. (R. 421-22). He noted that plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods to perform simple tasks, his ability to adhere to a schedule and maintain regular attendance, his ability to work close to others without being distracted, and his ability to handle normal work stress. Id. Dr. Collins noted that plaintiff was extremely limited in his ability to maintain attention and concentration for extended periods to perform detailed tasks. Id. Under the Category titled Social Interaction, Dr. Collins noted that plaintiff was moderately limited in his ability to interact appropriately with the public, his ability to work with others without causing distractions, and his ability to maintain socially appropriate behavior and basic standards of neatness and cleanliness. (R. 422). Dr. Collins noted that plaintiff was extremely limited in his ability to accept instructions and criticism from supervisors. Id. Dr. Collins checked the box indicating that plaintiff could "manage benefits in his or her own best interest." Id.

On September 30, 2004, Dr. Collins noted sleep and anger problems. (R. 456). On February 23, 2005, Dr. Collins noted that plaintiff experienced mood and sleep problems. (R. 453).

Dr. Collins completed the second MSS on May 31, 2005. (R. 447-49). Under the category titled Understanding and Memory, Dr. Collins noted that plaintiff was moderately limited in his ability to remember locations and work-like procedures and in his ability to understand and remember simple instructions. (R. 448). He noted that plaintiff was extremely limited in his ability to understand and remember detailed instructions. Id. Under Attention and Concentration, Dr. Collins noted that plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods to perform simple tasks, his ability to adhere to

6

a schedule and maintain regular attendance, and his ability to handle normal work stress. Id. Dr. Collins noted that plaintiff was extremely limited in his ability to maintain attention and concentration for extended periods to perform detailed tasks, to work close to others without being distracted, and to perform at a consistent pace without an unreasonable number or length of rest periods. Id. Under Social Interaction, Dr. Collins noted that plaintiff was markedly limited in his ability to interact appropriately with the public, his ability to work with others without causing distractions, and his ability to maintain socially appropriate behavior and basic standards of neatness and cleanliness. (R. 447). Dr. Collins noted that plaintiff was extremely limited in his ability to accept instructions and criticism from supervisors, and he checked the box indicating that plaintiff could "manage benefits in his or her own best interest." Id.

Dr. Collins completed the third MSS on November 29, 2005. (R. 475-78). Dr. Collins noted that plaintiff was extremely limited in every section of every category. Id.

Plaintiff saw Dr. Collins on January 4, 2006. (R. 479). Dr. Collins noted that plaintiff was not manic or psychotic and was stable on his medication. Id. Throughout the time that Dr. Collins saw plaintiff, he stated on several occasions that plaintiff's mood was euthymic to depressed. (R. 453-96).

Plaintiff was seen regularly at Grand Lake Mental Health Center from 2006 to 2010. (R. 488-512, 523-37, 681-738). During this time, he complained of symptoms of depression. Id. Plaintiff's GAF score on January 22, 2007 was 41. (R. 492). On January 23, 2009, his GAF score was 43. (R. 630). On July 31, 2009, plaintiff had a GAF score of 44. (R. 729). On February 26, 2010, plaintiff had a GAF score of 51. (R. 717). While being treated at Grand Lake Medical Center, Shirley Chestnut, D.O. was plaintiff's physician.

Dr. Chestnut completed the first of two MSSs on January 29, 2007. (R. 514-15). Under Understanding and Memory, Dr. Chestnut noted that plaintiff was moderately limited in his ability to remember locations and work-like procedures and in his ability to understand and remember simple instructions. Id. She noted that plaintiff was markedly limited in his ability to understand and remember detailed instructions. Id. Under Attention and Concentration, Dr. Chestnut noted that plaintiff was moderately limited in his ability to perform at a consistent pace without an unreasonable number or length of rest periods. Id. Dr. Chestnut noted that plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods in order to perform simple tasks, his ability to adhere to a schedule and maintain regular attendance, his ability to work close to others without being distracted, and his ability to handle normal work stress. Id. Dr. Chestnut noted that plaintiff was extremely limited in his ability to maintain attention and concentration for extended periods in order to perform detailed tasks. Id. Under Social Interaction, Dr. Chestnut noted that plaintiff was moderately limited in his ability to interact appropriately with the public, his ability to work with others without causing distractions, and his ability to maintain socially appropriate behavior and basic standards of neatness and cleanliness. Id. Dr. Chestnut noted that plaintiff was extremely limited in his ability to accept instructions and criticism from supervisors. Id. Dr. Chestnut checked the box indicating that plaintiff could "manage benefits in his or her own best interest." Id.

Plaintiff saw Dr. Chestnut on March 27, 2007. (R. 530). She reported that plaintiff was still having problems with depression. Id. She decided to increase the amount of Zoloft he was prescribed and Lunesta was continued. Id. On April 24, 2007, plaintiff saw Dr. Chestnut again and reported that he was doing fairly well and was not having any severe depression or suicidal ideation. Id. His treatment was continued. Id.

Plaintiff saw Dr. Chestnut on May 22, 2007. (R. 527). She noted that plaintiff reported feeling "the same." Id. She decided to discontinue Zoloft. Id.

Plaintiff saw Dr. Chestnut on June 19, 2007. (R. 525). She noted that he continued to struggle with "some depression." Id. She decided that his treatment would be continued. Id.

Plaintiff saw Dr. Chestnut on July 17, 2007. (R. 523). Plaintiff reported sleep problems and mild to moderate depression. Id. Dr. Chestnut decided to discontinue Lunesta. Id. She prescribed Trazadone for sleep. Id.

Plaintiff saw Dr. Chestnut on August 14, 2007. (R. 536). She noted that plaintiff continued to report sleeping problems. Id. She prescribed Rozerem, and discontinued his Trazodone prescription. Id.

Plaintiff saw Dr. Chestnut on September 11, 2007, and reported that he was feeling "okay." (R. 577). His visits to Dr. Chestnut on October 9, 2007 and November 6, 2007, were essentially the same and resulted in no changes to his treatment plan. (R. 574).

Plaintiff saw Dr. Chestnut on December 4, 2007, and reported that he was continuing to have sleep problems. (R. 568). Id. Dr. Chestnut discontinued Rozerem and prescribed Amitriptyline. Id.

Plaintiff saw Dr. Chestnut on January 3, January 28, and February 26, 2008, and on all three occasions reported that he was feeling "about the same." (R. 566). Dr. Chestnut continued his treatment plan. Id. Plaintiff saw Dr. Chestnut on March 25, 2008, and reported that he was doing fairly well on his current medications. (R. 558).

On April 23, 2008, plaintiff was committed to Wagoner Community Hospital after he barricaded himself in his home with an unloaded gun, demonstrating suicidal behavior. (R. 537).

9

After he was stabilized, plaintiff was prescribed Effexor and Thorazine. (R. 544). He was discharged on April 29, 2008. (R. 537).

Plaintiff saw Dr. Chestnut on May 6, 2008. (R. 553). She noted that the doctors at Wagoner Community Hospital made some changes in his medication, and she decided to continue those medications. Id.

Plaintiff saw Dr. Chestnut on June 12, 2008, while he was living at Souls Harbor, a local shelter. (R. 552). Plaintiff reported that he was doing fairly well. Id. Dr. Chestnut noted that he did not have severe depression at the time of the visit. Id. Plaintiff saw Dr. Chestnut on July 10, 2008. (R. 551). Plaintiff reported that he was doing well on his medications and felt "about the same." Id. She continued his treatment plan. Id.

Plaintiff saw Dr. Chestnut on August 7, 2009. (R. 737). He reported that he was doing fairly well. Id. Dr. Chestnut continued his treatment plan. Id. On that same day, she completed her second MSS. (R. 678-79). Under Understanding and Memory, Dr. Chestnut noted that plaintiff was moderately limited in his ability to understand and remember simple instructions. Id. She noted that he was markedly limited in his ability to remember locations and work-like procedures. Id. Dr. Chestnut also noted that he was extremely limited in his ability to understand and remember detailed instructions. Id. Under Attention and Concentration, Dr. Chestnut noted that plaintiff was moderately limited in his ability to adhere to a schedule and maintain regular attendance. Id. She noted that plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods to perform simple tasks. Id. Dr. Chestnut noted that plaintiff was extremely limited in his ability to maintain attention and concentration for extended periods to perform detailed tasks, his ability to work close to others without being distracted, his

ability to perform at a consistent pace without an unreasonable number or length of rest periods, and his ability to handle normal work stress. Id.

Under Social Interaction, Dr. Chestnut noted that Plaintiff was moderately limited in his ability to maintain socially appropriate behavior and basic standards of neatness and cleanliness. Id. She noted that plaintiff was markedly limited in his ability to interact appropriately with the public, his ability to accept instructions and criticism from supervisors, and his ability to work with others without causing distractions. Id. Dr. Chestnut wrote in the additional comments section of the MSS form that "[Plaintiff had a] long-term history of major depressive disorder. [He is] resistant to therapy and antidepressant medication." Id. She checked the box indicating that plaintiff could "manage benefits in his or her own best interest." Id.

Plaintiff saw Dr. Chestnut on January 22, 2010. (R. 730). Plaintiff did not have any complaints and reported that his medications were helping. Id.

Plaintiff saw Amykay Cole, Ph.D., for a consultative examination on January 22, 2004. (R. 414-18). Dr. Cole diagnosed him with severe and recurrent Major Depressive Disorder without psychotic features, polysubstance dependence (reportedly in remission), Dysthymic Disorder with early onset, and a personality disorder. (R. 417). At the time of the consultation, plaintiff had a GAF score of 55. (R. 418). Dr. Cole wrote that plaintiff would probably be able to understand complex instructions, but his ability to concentrate and persist in tasks was probably limited due to his, then current, depressive episode. Id. Dr. Cole wrote that plaintiff would most likely not be able to work well with the general public due to his depressive state; however, he would be able to work with a small number of coworkers in a simple workplace environment. Id.

Plaintiff saw Kevin Whisman, Psy.D, for a consultative examination on October 11, 2004. (R. 428-31). Dr. Whisman affirmed the diagnoses of Dr. Cole. (R. 431). Plaintiff's GAF

11

score at the time of visit was 65. Id. Dr. Whisman wrote that plaintiff did not appear to have any defects in his ability to understand and remember instructions. Id. Dr. Whisman found that plaintiff had an adequate ability to sustain concentration and persistence of tasks. Id. Dr. Whisman wrote that plaintiff could function well in a socially restrictive environment and could manage his personal funds. Id.

Plaintiff saw Jan Kent, Ph.D., for a consultative examination on May 21, 2007. (R. 517-22). Dr. Kent reaffirmed Dr. Cole's diagnosis. (R. 520). Dr. Kent scored plaintiff's GAF from "45 to 55." Id. On the examination form, Dr. Kent checked the box indicating that plaintiff's ability to understand, remember and carry out instructions was not affected by his impairment. (R. 521). On that same form, Dr. Kent checked the box indicating that plaintiff was slightly limited in his ability to respond appropriately to co-workers, the general public, and to changes in a routine work setting. Id. Dr. Kent checked the box indicating that plaintiff was moderately limited in his ability to respond appropriately to supervisors, and markedly limited in his ability to respond appropriately to work pressures in a usual work setting. Id. Dr. Kent noted that her findings were supported by plaintiff's withdrawn behavior during their interview and his medical record, which indicated severe depression. Id. Dr. Kent wrote that plaintiff showed no impairment in attention and concentration skills on the mental status evaluation. (R. 520). Dr. Kent wrote that with intensive and ongoing psychological management of his problems, plaintiff's condition would most likely improve within a year. Id.

Non-examining state agency consultant Geoffrey Sutton, Ph.D., completed two Mental Residual Functional Capacity forms. (R. 390-92, 425-26). The first form was completed on February 3, 2004. (R. 390-92). Dr. Sutton found that plaintiff had moderate limitations in his ability to carry out detailed instructions, interact appropriately with the public, and accept

instructions and respond appropriately to criticism from his supervisors. (R. 390-91). The second from was completed on November 8, 2004. (R. 425-26). It is practically identical to the first form. (R. 390-92, 425-26).

**The ALJ Hearing**

Plaintiff was 50 years old at the time of the August 13, 2012 hearing before ALJ Headrick. (R. 789, 792). He had completed the eleventh grade, and did not receive a GED. (R. 793). Plaintiff's only training was conducted on the job. Id. His last job was at a Wal-Mart in 2002, as the overnight maintenance supervisor. Id. Plaintiff quit because "they did away with [his] position." Id. Before working at Wal-Mart, plaintiff was a machinist (from 1995 to 1998). (R. 794). Plaintiff testified that he had not attempted to find another job because he lacked the motivation to look. (R. 794). He said that "due to depression [he] ha[d] no desire to get out to do anything." (R. 795). Plaintiff spends his days listening to the television at his home. Id. Plaintiff said that he can concentrate on what he is watching for 30 to 45 minutes before his mind begins to wander. (R. 799-800). Plaintiff takes the dog out every morning, but other than that, he stays in his apartment. (R. 795). He eats TV dinners and soup because he has no motivation to prepare anything more complicated. Id. Plaintiff does his own laundry. (R. 805).

Plaintiff bathes irregularly, sometimes once a week and other times every couple of weeks because he does not feel like bathing often. (R. 796). Plaintiff grocery shops about once a week, and he can get his shopping done in 15 to 20 minutes because the people in the store aggravated him. (R. 796-97).

Plaintiff does not like being around people in general, and when he was working, he had conflicts with his supervisor. (R. 797-98).

Plaintiff has two daughters. Id. About once every two to three months, one of his daughters visits him and takes him to dinner. Id. He does not have conflicts with anyone while at restaurants with his daughter. Id.

Plaintiff has a history of depression and depression-related problems. On April 27, 2000, he was hospitalized at Freeman Hospital for suicidal gestures and self-inflicted wounds. (R. 307-08). He was discharged on May 1, 2000. Id.

Plaintiff testified that he continues to struggle with suicidal thoughts. (R. 800). He said that this struggle had gotten better since he started his medication, but suicidal thoughts cross his mind about once a month. (R. 800-01). However, plaintiff does not believe that his depression medication works. Id. Plaintiff does not feel the need to make friends, and he does not have any friends. (R. 802). Plaintiff attended group therapy for some period of time until the institution's funding was cut. (R. 791). Plaintiff stated that he had no conflicts with anyone in the group therapy. Id. Since the group therapy ended, plaintiff has digressed to a state of not wanting to be around people. (R. 803).

## ANALYSIS

On appeal, plaintiff raises three issues. (Dkt. # 17). First, plaintiff argues that the ALJ failed in properly considering the medical source opinions. Plaintiff contends that the ALJ did not incorporate any work restrictions into his RFC determination to compensate for limitations in his ability to work with and/or around co-workers and supervisors that were found by his treating physicians, agency consultative examiners, and non-examining agency reviewers. Id. He argues that since all the doctors agree there is some limitation in that area, the opinions from his treating physicians should be given deference. Id. The Commissioner argues that the ALJ properly discounted the treating physicians' opinions based on their treatment records. (Dkt. # 18).

Second, plaintiff asserts that the ALJ failed to properly consider plaintiff's credibility. (Dkt. # 17). He states that the ALJ's reasons for his credibility findings are not supported by substantial evidence. The Commissioner counters that the ALJ's credibility findings are grounded in statements found in plaintiff's treatment notes. (Dkt. # 18).

Finally, plaintiff argues that the ALJ's RFC determination was faulty because it did not reflect all of plaintiff's impairments. (Dkt. # 17). The Commissioner answers this argument by saying that the ALJ's RFC determination is not flawed because he properly discounted plaintiff's treating physician opinions. (Dkt. # 18).

**Medical Source Opinion Issues**

Plaintiff argues that the ALJ erred in stating that the opinions of Dr. Collins and Dr. Chestnut were not supported by the record. (Dkt. # 17 at 7-8). Additionally, plaintiff argues that even if the opinions of the treating physicians are not entitled to controlling weight, they are at least entitled to some weight because parts of them concur with all the other medical opinions. Id.

Generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight. Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004). An ALJ must consider the opinion evidence and, if he rejects it, he must provide specific legitimate reasons for the rejection. Doyal v. Barnhart, 331 F.3d 758, 763-64 (10th Cir. 2003); Victory v. Barnhart, 121 Fed.Appx. 819, 825 (10th Cir. 2005) (unpublished). So long as the ALJ gives good reasons for the weight he gives to treating medical opinions, nothing more is required. Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007).

Here, the ALJ found that the opinions of plaintiff's two treating physicians were each internally inconsistent because both doctors listed marked to extreme limitations in their MSS forms but neither addressed those limitations in the treatment notes. (R. 26). An MSS form asks a physician to evaluate an individual's capacity to sustain certain activities during an eight-hour workday. (R. 421). Since plaintiff was not working when he was seeing Dr. Collins and Dr. Chestnut, it is not surprising or improper for them not to have mentioned work-related limitations in their treatment notes. In fact, the MSS form may have been the only time the doctors were asked to address plaintiff's employment limitations.

The ALJ also reasoned that Dr. Collins' MSS is not supported by his treatment notes because Dr. Collins reported in 2006 that plaintiff was doing well on his medications, had no psychotic or manic symptoms, and was stable. (R. 26). Dr. Chestnut saw plaintiff four times from the beginning of January to the end of March in 2008. (R. 558, 561, 564, 566). The first three times, plaintiff reported that he was feeling "about the same," referring to his previous visit. On March 25, he reported that he was doing fairly well. From this information, one could say that plaintiff was stable for the first three visits and was doing fairly well after the fourth visit. However, the recurrent nature of plaintiff's major depressive disorder was displayed one month later on April 23, when he was hospitalized after demonstrating homicidal and suicidal ideations. (R. 537-550). Thus, it is not inconsistent to find that plaintiff had marked or extreme limitations in certain areas at times when his symptoms were more manageable because the nature of his recurrent ailment is episodic, and the ALJ did not cite any evidence indicating that Dr. Collins or Dr. Chestnut were incorrect in diagnosing plaintiff with severe and recurrent major depressive disorder.

Furthermore, the ALJ relied on the opinions of the state's physicians, who had Dr. Collins' MSS in the record to consider. (R. 27). All of the state physicians found limitations in plaintiff's ability to work, especially with the public and with supervisors. Presumably, the evidence for those limitations came from Dr. Collins' treatment records, which the ALJ claimed did not give any indications of marked to extreme limitations. Id. Since the ALJ never articulated why the record would support a moderate limitation and not a marked or extreme limitation, he did not meet his burden of giving specific legitimate reasons for rejecting Dr. Collins and Dr. Chestnut's opinions. The ALJ also erred by not explaining why he chose to adopt certain "moderate" restrictions imposed by the agency physicians, but not all, especially since he gave those opinions "great weight." See Frantz v. Astrue, 509 F.3d 1299, 1302-03 (10th Cir. 2007).

**Credibility Issues**

Plaintiff argues that the ALJ erred in properly considering his credibility. (Dkt. # 17 at 7-9). The undersigned finds no error with the ALJ's credibility analysis.

Credibility determinations by the trier of fact are given great deference. Hamilton v. Secy. of Health & Human Servs., 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

White, 287 F.3d at 910. In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. See Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186. "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court. Keyes-Zachary v. Astrue, 695 F.3d 1156, 1167 (10th Cir. 2012).

Here, the ALJ found that plaintiff was not entirely credible due to the record. (R. 27). The ALJ supported his finding with plaintiff's own testimony in which he stated that he walked the dog, shopped, and cooked. (R. 25). The ALJ further supported his finding by stating that plaintiff said he did not quit work because of his disability, but because he "was not motivated to go out and look for a job." (R. 26). Because the ALJ cited to specific evidence in the record to support his credibility determination, the Court must defer to that determination, and affirm this issue. Bean v. Charter, 77 F.3d 1210, 1213 (10th Cir. 1995).

**RFC Assessment Issues**

When the ALJ reconsiders the medical source evidence, a reconsideration of plaintiff's RFC may be appropriate. The Court will not otherwise address this issue.

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner for further proceedings consistent with this Opinion and Order.

SO ORDERED this 24th day of September, 2013.

_____
T. Lane Wilson
United States Magistrate Judge